THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RAMONITA SÁNCHEZ LUGO, Defendant and Appellant.

No. CR-67-276.     Decided October 2, 1968.

*Ildefonso Freyre* for appellant. *Rafael A. Rivera Cruz, Solicitor General,* and *Juan José Ríos Martínez, Assistant Solicitor General,* for The People.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The prosecuting attorney filed an information against appellant, Ramonita Sánchez Lugo, in the Superior Court,

Mayagüez Part, charging her with the commission of three offenses defined by the Weapons Law of Puerto Rico, 1951, to wit:

1st.—Violation of § 8, felony, consisting in that on February 24, 1967 and in Mayagüez, defendant, illegally, wilfully, and maliciously, *was bearing, carrying, and transporting, a* loaded *revolver*, for the purpose of offense and defense, without having a license to carry weapons issued by the Part of the Superior Court corresponding to her domicile, or by the Chief of Police of Puerto Rico, said revolver being a firearm with which grave bodily injury may be caused.

2nd.—Violation of § 6, misdemeanor, consisting in that defendant, on the date, place, and circumstances aforementioned, illegally, wilfully, and maliciously, *had in her possession and control the same revolver*, without having previously obtained a license issued by the Chief of Police of Puerto Rico, or by the Superior Court, Mayagüez Part, for the possession thereof.

3rd.—Violation of § 32 (a), misdemeanor, consisting in that "Said defendant, on the date, place, and under the circumstances stated, illegally, *wilfully, maliciously, and intentionally*, fired several shots with a revolver, which is a firearm, in the presence of persons who could have received bodily injuries, without it being in self-defense, and without said defendant being in the discharge of official duties of any kind whatsoever."

The three counts were tried jointly, on June 22, 1967, the first by a jury and the second and third, both misdemeanors, by the court.

The jury returned a verdict of not guilty in relation to the bearing, carrying, and transporting of the loaded weapon.

After the verdict was read, the presiding judge found defendant guilty of the misdemeanor charges, making the following statements:

"JUDGE:

"The others are submitted to the consideration of the court, by the court without a jury. The court regrets to state that it does not concur with the opinion of the jury and, on the other hand, it understands that there is evidence beyond reasonable doubt to find that lady guilty, and therefore, in case M-67-242, the court finds her guilty of a violation of § 6 of the Weapons Law, misdemeanor. And in case M-67-243, it finds her guilty of a violation of § 32(a). As to the date for the pronouncement of sentence, defendant, please sit down over there."

The defense moved for reconsideration, and while it argued its motion the judge interrupted in the following terms:

"JUDGE:

"Colleague, do not waste any more time. The court believed the evidence of the People. Especially that of Celedonio Muñiz, post-office employee, who heard her speak spontaneously at the time of the commotion, from which the facts arise. When she is surprised by him and he seized her and seized her husband and she says 'let him go, he is not guilty, I am the guilty one and I fired the shots.' Those sincere and spontaneous statements were believed by the court. The court has not believed the explanation she gave as to why she said them. Hence, the court believes and understands that there is sufficient evidence, beyond a reasonable doubt, to convict her. And that, furthermore, the evidence on the 'corpus delicti' is very abundant in the three cases. If the jury did not believe the evidence, or understood it otherwise, or wanted to favor the defendant with a verdict of not guilty, because of pity, or for whatever reason, the court cannot, should not, and need not abide by the decision of the jury. Sincerely and honestly, the court understands that the defendant is guilty, beyond a reasonable doubt. For that reason, it has found her guilty in these cases. Therefore, it denies our colleague's motion for reconsideration."

Subsequently, the defense presented a petition entitled "Motion for New Trial," which was opposed by the prosecuting attorney. The new trial was denied. But the judge reconsidered his judgment as to the second charge of the pos-

session and control of the revolver by the defendant, without having a license therefor, and acquitted her of violation of § 6 of said Act.

As to the remaining third count, as it appears from the minutes of September 29, 1967,

"The court understands that the evidence presented in case M-67-243 supports said offense and it leaves in full force and effect the judgment rendered."

Judgment was rendered for violation of § 32 (a) of the Weapons Law of Puerto Rico, sentencing defendant to one year in jail. The probation officer having rendered a report "favorable to defendant's interest" the court stayed the effects of the sentence, permitting defendant to serve the same on probation as long as she complied with the nine conditions imposed by the court.

On this appeal, appellant assigns the commission of the following errors:

### "FIRST ERROR

"The trial court committed error of fact and of law in finding defendant guilty of a violation of § 32(a) of the Weapons Law, on the sole ground of the extrajudicial admissions or confessions that she made in the post office immediately after the incident which occurred therein.

### "SECOND ERROR

"The trial court committed error of law, in admitting in evidence a handbag which, according to witness Celedonio Muñiz, was found about two weeks before the hearing of the case in one of the mailboxes which the post office has in different places in the city of Mayagüez, without having established a truthful sequence of the possession of said handbag, and without having submitted the same to an expert examination to determine that the two holes which appeared thereon had been caused by firearm shots.

## *"THIRD ERROR*

*"The trial court erred in denying the defendant's petition to the effect that the handbag be submitted to expert examination before rendering judgment against her."*

Before proceeding to the examination of the errors assigned, we shall insert in this opinion the following recital of the evidence offered at the trial by both parties, which the Solicitor General himself makes in his report:

"The evidence for the People consisted of the testimony of María L. Minguela, who, in synthesis, testified that about 6:00 or 6:30 p.m. on February 24, 1967, she went to the post office in Mayagüez, to get her mail. (Tr. Ev. 8.) While she was reading a letter she had received that day, appellant's husband arrived and they began to talk. They were talking, when appellant arrived at the post office and asked her husband what was he doing there. When he did not answer, appellant asked the witness what was he telling her; the witness answered that he was telling her that he wanted to get a divorce, but that appellant did not give her consent. Appellant said that they were living savagely and immediately she showed her a black mark she had on her shoulder and told the witness, 'Look, he did this to me.' Because of that the husband said, 'That is a lie, I did not do that to you. Now I will get a divorce.' Then, with an angry gesture, she opened a handbag and he pounced upon her and they struggled. While they were struggling, two detonations were heard. They continued struggling after the two detonations and appellant's husband told the witness that he had been hurt, and told her to go away so that she would not be hurt. The witness did not see any weapon in the hands of Arsenio González Seda, appellant's husband, nor in appellant's hands. Only the three of them were present there. This occurred in the hall where the mailboxes were. (Tr. Ev. 9–11.) When Arsenio González said that he was going to get a divorce, he was nervous and violent. (Tr. Ev. 22, 28.)

"Celedonio Muñiz Rodríguez testified that he is an employee in the post office in Mayagüez (Tr. Ev. 36) ; that about 7:00 or 7:15 p.m. on February 24, 1967, he was acting as supervisor in the office and he heard two detonations. Immediately he ran and opened the door which leads to the place from where he had

heard the detonations, and he found appellant and her husband struggling; that he seized her and she said, 'Let me go and let him go because I am the only one guilty, I was the one who fired the shots'; that he asked for the weapon and she answered that she did not know; that then a fellow worker arrived and together they succeeded in separating them. (Tr. Ev. 37–39.) Appellant repeated identical statements to the fellow worker and then to the police, and that these statements were made by her, voluntarily. (Tr. Ev. 41.) This occurred in the post office, in the front hall where the mailboxes are. (Tr. Ev. 37.) Two weeks before, while he was working at nighttime, he found the handbag on his desk. (Tr. Ev. 42–43.) He took it in his hands and immediately identified it as the handbag that appellant had on the day of the events, because it had two bullet holes. (Tr. Ev. 43–44.) The handbag was marked Exhibit 1 of the People. (Tr. Ev. 45.) The witness also identified several photographs of the post office of Mayagüez, of a garbage can, and of a wall which had impacts of the bullets. (Tr. Ev. 45–47.) The impacts of the bullets were below a mailbox, on a glazed colored tile, about 6 inches from the floor. (Tr. Ev. 49.) The handbag was found in a mailbox and the postman who found it took it to the post office. Immediately he notified the prosecuting attorney of it. (Tr. Ev. 52–53.) The witness avers it is the same handbag because it had the two holes and it was made of the same material of the particles left on the floor when the bullets pierced it. (Tr. Ev. 54.) Neither appellant nor her attorney had any means to know that the handbag had been found. (Tr. Ev. 55–56.)

"Witness José Enrique Ruiz testified, in synthesis, that about 6:00 or 7:00 p.m. on February 24, 1967, while he was working inside the post office he heard two shots; that Celedonio Muñiz went out immediately and he followed him; that when he went out he found appellant and her husband struggling; that when he was going out appellant said, 'nothing happened here, I was the one who fired.' (Tr. Ev. 58.) When the witness went out he only saw the two of them and he did not see any weapons in the hands of either of them. (Tr. Ev. p. 59.)

"Eduardo Silva testified that he was a state policeman and that on February 24, 1967, by reason of a complaint, he went to the post office of Mayagüez. (Tr. Ev. 73.) He noticed that on the lower part of the wall there was a bullet impact; that about

two or three feet from the impact, there were two flat bullets on the floor; that he continued his investigation and that in a garbage can which was near a table, he found a wrapped short-barrel Colt revolver loaded with four bullets and two empty shells. (Tr. Ev. 64–65.) He identified the bullets, the barrel, and the shells. (Tr. Ev. 66–67.) Spontaneously and wilfully, without being asked, appellant told him that she was the one who had fired. (Tr. Ev. 67.) The witness passed his finger over the barrel of the revolver, and besides the trigger, he noticed something like carbon, like gunpowder. (Tr. Ev. 69.)

"After this testimony, the prosecuting attorney presented all the exhibits of the People and a license to have and possess a firearm, issued to Arsenio González Seda, appellant's husband, which corresponded to the revolver presented in evidence. (Tr. Ev. 69–70.) The defense objected to the admission of the handbag in evidence, because a sequence of the possession of the same had not been established (Tr. Ev. 70–71) and it acquiesced to the admission of the rest of the evidence. The judge admitted all the evidence offered. (Tr. Ev. 71.)

"Appellant testified as witness for the defense. In synthesis, she said that she had been married to Arsenio González for two (sic) years. (Tr. Ev. 76.) On the day of the events she went to the post office to mail a letter. When she came out she saw her husband talking to Mrs. Minguela. (Tr. Ev. 78.) She asked her husband, what were they doing there, and he answered, nothing. Mrs. Minguela told her that Arsenio still intended to get a divorce from appellant to marry her, since they did not live together. Mrs. Minguela asked appellant why she would not give Arsenio the divorce, to which she answered that he had not asked her consent for the divorce and that they lived together. The witness showed to Mrs. Minguela a hematoma which Arsenio, her husband, had caused to her on her shoulder, which she said was caused sexually. Arsenio denied having caused the hematoma to her and said, 'Now you will have to consent to the divorce'; Arsenio became furious and told her to go away, or he would kill her. She pounced upon him and struggled with him because she knew that he had a weapon. While they struggled the detonations were heard. The witness assured that *he did not fire* and under the nervous strain she found herself lost, her home destroyed, and she wanted to take the blame; that she did not take that revolver to the post office; that she has never had it

in her hands and that she did not fire it. (Tr. Ev. 79–81.) She testified that she knew that Arsenio had that revolver because a month earlier their house had been robbed and since then he always carried it. She stated that she blamed herself because she was nervous and because she was disappointed when he showed that his home and his children meant nothing to him; that then, she said to herself 'I am not necessary to them because I do not work, he is more necessary than I am.' (Tr. Ev. 82–83.) She denied that the handbag presented in evidence was hers. (Tr. Ev. 83.) She averred that Arsenio was the one who hid the revolver in the garbage can. (Tr. Ev. 84.) Although there is a mailbox outside the post office, she went inside to mail the letter because she had important news for her daughter and wanted the letter to be stamped and sent away soon. She explained the struggle between her and her husband. (Tr. Ev. 97–98, 100.) She emphasized that she never touched the revolver; that her husband always had it and she never touched it. (Tr. Ev. 100.) She repeated that when witness Celedonio Muñiz arrived she blamed herself because she felt that her home was destroyed. (Tr. Ev. 103–104.)"

I.—In the light of the recited evidence for the prosecution, which was presented at the trial, and according to our decisions on this point, among them, *People* v. *Hernández*, 75 P.R.R. 852, 860 (1954) and *People* v. *Campos*, 86 P.R.R. 293, 299 (1962), we consider that the corpus delicti had been sufficiently established and, therefore, that the first error was not committed.

II and III.—The second and third errors refer to the admission in evidence of a certain handbag and to the refusal that the same be submitted to expert examination.

The existence of a handbag in possession of appellant, Ramonita Sánchez, at the time when she and her husband Arsenio González were struggling violently at the post office in Mayagüez, was established by the testimony of María Minguela.[1] But, in no manner whatsoever were its color, size,

---

[1] Minguela was taking steps for her divorce from her husband, Héctor Acevedo, residing in New York. Arsenio González, at the time, was trying to get "the consent for divorce" from his wife Ramonita

form, and material shown. The "handbag" was only mentioned.

The two post-office employees who immediately arrived at the place where appellant, her husband, and the latter's friend were, did not permit appellant and her husband to leave the place. They called the police. Shortly thereafter, Sergeant Vasallo and policemen Aníbal Pérez and Eduardo Silva, arrived at the place "to investigate the event at the post office." The police talked to all the persons who were at the post office, they made searches and found a revolver in a garbage can and two flat bullets on the floor. They took photographs of the bullet impacts. But in no manner whatsoever did they seize or find the handbag.

The events occurred on February 24, 1967. The trial was held four months later, on June 22.

Two weeks before the trial, that is, about June 8, Celedonio Muñiz, a post-office employee who testified at the trial, while he was working at nighttime found a handbag *on his desk*; then, according to what he testified, ". . . I took the handbag and when I took it in my hands . . . I asked about the handbag and they told me. . . . I immediately identified the handbag because . . . which she had on the night of the events . . . *because it had two bullet perforations.*"

Muñiz' behavior is rather strange: He showed much interest in the investigation of the facts on the night of February 24. As soon as he reached the place he started to question appellant, he asked her about the weapon, she answered, "I do not know"; and according to Muñiz: "Then

---

Sánchez. Arsenio and Minguela would get married as soon as they were free from their respective wife and husband. As the latter said at the trial ". . . I love him . . . if he gets a divorce I will marry him." (Tr. Ev. 21.) At the post office when appellant asked her what was she talking about with her husband, Arsenio, she answered:

". . . that he was telling me the same thing, that he persisted with his purpose. That he was telling me that he was going to get a divorce, but that appellant did not want to give her consent." (Tr. Ev. 9.)

we started to struggle up to the door, but then my fellow worker arrived and I told him, 'get hold of him, I will get hold of her' so that they cannot escape; because they wanted to escape, you see." Notwithstanding all this and although he had in his hands, according to him, the handbag with the "two bullet holes," he did not deliver it to the police, nor furnished any information in relation to the handbag.

He was asked by the defense: "Tell me, witness, did you tell the police or the prosecuting attorney that night that you had seen any handbag there?" He answered: "I do not remember . . . . That I do not remember . . . if I said it, I do not remember." Tr. Ev. 51.

He was asked how the handbag had been found two weeks before the trial. He explained that a postman, whose name he could not mention "left it at the postal office . . . on the desk where I was working."

No other witness corroborated what Celedonio Muñiz said about the handbag. Not even the alleged postman who "found it in a mailbox on a street in Mayagüez" and left it on Muñiz' desk, was brought to court. He could not give his name either. On that occasion, a few days prior to the trial, he delivered it to the prosecuting attorney. Defendant-appellant and her attorney came to know about the existence of the handbag, "which had two bullet perforations," at the moment of the trial in which Celedonio Muñiz testified. There is no controversy as to this point. This significant circumstance is related by the Solicitor General in his report.

The two holes which appear on one of the folding sides of the handbag are also strange. We have traced said two holes and the same appear this way:

The defense asked witness Muñiz whether he could affirm that the two perforations were bullet holes because he had submitted them to some analysis. He answered no.

Subsequently, defendant's attorney, while he objected to the use of the word "perforations" by the prosecuting attorney, stated to the court ". . . here nobody has proved, no expert, nobody, nothing, that those are perforations and much less bullet perforations."

The act of the pronouncement of sentence was postponed for September 22, 1967. On the 18th day of said month the defense presented a motion for new trial in which, among other things, it alleged:

"2.—Defendant respectfully understands that the court committed error of law in admitting in evidence a handbag which, according to witness Celedonio Ortiz' testimony, was found in one of the mailboxes which are found in different places in the city of Mayagüez, about two weeks prior to the day of the trial in this case, without a true sequence of possession of said handbag having been established, and without having submitted the same to an expert examination to determine that the two holes which appear in said handbag had been caused by firearm shots.

"In relation to said handbag, presented and admitted in evidence, defendant formally requests that in furtherance of justice the same be submitted to an expert examination by any of the experts of the Division of Criminal Investigation of the Police Force of Puerto Rico; with the assistance of an expert designated by the defendant, the latter proposing that said holes which appear on such handbag admitted in evidence be examined to determine whether or not there is any residue of gunpowder, and also proposing that the experts to be designated, using the same revolver which belongs to defendant's husband, which was admitted in evidence, and with two of the bullets of said revolver, which were also admitted in evidence, shall fire, in the proper place, two shots inside the handbag in order to observe the result and the kind of perforations that two shots with that firearm or any other firearm of said caliber would cause in said handbag or any other handbag under the same circumstances.

"Appellant alleges that before the trial she did not have any opportunity to request that said handbag be submitted to the expert examination, which she now requests, because she had no knowledge that said handbag was going to be presented in evidence against her, until the very day of the trial. See Transcript of Evidence, p. 55, where the prosecuting attorney closes his interrogatory to witness Celedonio Muñiz."

As afore-stated, the motion for new trial was denied, but the judge reconsidered his judgment in relation to the violation of § 6 charged, acquitting appellant therefrom.

The court admitted the handbag as evidence for the prosecution on the identification thereof by Celedonio Muñiz at the trial, since this witness asserted he identified it as the one that defendant was carrying that night, and which he had in his hands. When Muñiz' statements were considered as true, there arose a motive for its admission.

But we are not entirely satisfied, beyond a reasonable doubt, with the certainty of Celedonio Muñiz' statement in the sense that the "openings" as the judge said, or the "holes," according to the defense, or the perforations, as the prosecuting attorney states, are the unavoidable and natural consequence of precisely the two detonations, discharges, or

shots heard or fired during the violent struggle between husband and wife for the possession of the weapon at the post office in Mayagüez.

The handbag which Muñiz took to the prosecuting attorney a few days prior to the trial, as shown by the preceding drawing, has two openings which we have marked with letters A and B. Obviously, to any normal person, the one marked A does not correspond to the probable mark of a 38-caliber bullet, or of any other caliber. The B opening, on the other hand, could have been caused by bullet perforations, or with any cutting instrument, but quite blunt, like scissors.

Now, then, what cannot be explained, if it was fired from inside the handbag, is the condition of its two interior linings. They are intact in the front part or near the two openings. The folding side of the handbag measures 8 inches high. The principal lining has some three small holes about 6 inches high from the two openings of the exterior of the handbag.

In the presence of such conditions of the handbag, without a previous expert analysis thereof, its probative value for the purpose of showing that its two openings correspond to the precise shots or discharges which arose from that struggle is very doubtful. Therefore, the impression of correctness, probability or possibility of correctness which the statements of witness Muñiz made on the conscience of the trier, deserved, in our opinion, to be verified, if it was possible, by the result of the expert examination requested.

■ We believe that the second error was not committed. In relation to the third and last error assigned, our conclusion is different. In view of the petition for new trial on the ground that the handbag had not been submitted to a previous expert analysis, for the purpose of its admission in evidence and the weighing of its probative value, in the presence of all the attendant circumstances in this case, the court

should have, if it did not find grounds for the new trial, set aside also its judgment finding appellant guilty as to the violation of § 32 (a) of the Weapons Law, and continue with the trial which had commenced on June 22, to give defendant an opportunity to present expert evidence on the so-called perforations of said handbag, the unexpected presentation of which, as evidence for the prosecution, must have constituted a surprise for her and her attorney. No prejudice would have been caused to the parties by continuing with the trial. The denial of the opportunity of the expert analysis was an error.

But we must not dispose of the present appeal by remanding the case for the continuation with the trial before the court of first instance, inasmuch as, after thoroughly examining the evidence presented, we conclude that the facts proved do not constitute a violation of § 32 (a) of the Weapons Law of Puerto Rico, which, in its pertinent part, provides:

"Any person who, otherwise than in self-defense or in the discharge of official duty:

"(a) *wilfully discharges* any . . . revolver, or other firearm . . . in a public place or any other place where there is any person who may be injured, thereby, although no injury to any person ensues; . . . shall be guilty of a misdemeanor." (Italics ours.)

The penalty imposed by § 41 of the Weapons Law for the violation of § 32 (a) copied above is a minimum term of 30 days in jail and a maximum term of one year in jail. Appellant was punished, notwithstanding the favorable report of the probation officer, with the highest penalty of the law.

■ Our Penal Code, in subdivision 1 of its § 559, gives the following meaning to the word *"voluntariamente,"*—as a Spanish translation of the English term "wilfully";

"1. Wilfully. The word 'wilfully,' when applied to the intent with which an act is done or omitted, implies simply a *purpose*

*or willingness to commit the act, or make the omission referred to.*" (Italics ours.)

■■ "*Voluntario*" (wilful), according to the *Diccionario de la Lengua Española,* is the act which is born of the will and not by force or necessity extraneous to the former. "*Voluntad*" (will), is defined therein as intention, disposition, or resolution to do a thing; want or desire to do a thing.

Let us review, in part, the set of circumstances which arises from the evidence presented. For 12 years, Ramonita Sánchez Lugo had been married to Arsenio González Seda; they had begotten a daughter 9 years old and a son 7 years old; in the afternoon of February 24, 1967, she went with her sister-in-law, her husband's sister, to a beauty parlor, because that night she was going with her husband and her brothers to a dance; after leaving the beauty parlor she took her sister-in-law to a hotel in Mayagüez, where she was lodging during her visit in Puerto Rico; when they arrived at the hotel her sister-in-law asked appellant to mail a letter for her; she delivered the letter to appellant and the latter went to mail it; she arrived at the post office and mailed the letter; when she was leaving the post office she saw her husband, Arsenio González Seda, talking there with María Luisa Minguela.

Let this sole eye witness—following the Transcript of Evidence—recite the events that followed:

"A—When we were talking, his wife arrived at the post office. And then she asked him what he was doing there. He did not answer anything. He told her to go away and she did not go and she stayed there. She asked me what was he telling me. Then I told her that he was telling me the same thing, that he persisted with his purpose. That he was telling me that he was going to get a divorce, but that appellant did not want to give her consent.

"Q—What happened then, what did she say, if she said anything? After you . . . .

"A—Then, after I told her that, what he had told me, she said that they were living together, that they were living savagely. That while he was sick at the hospital, while serum was being administered to him, they had had sexual relations at the hospital and then she showed something black she had on her shoulder and told me 'look at this, he did it to me.'

"Q—Then, what did he do when she did that?

"A—He said, 'that is a lie, I did not do that to you. Now I will get a divorce.' Then she opened her handbag with an angry gesture and he pounced upon her and they struggled and during the struggle the detonations were heard.

"Q—What did he tell her . . . what did she say while they struggled?

"A—She only said, 'aha! yes, aha! yes.' She did not say anything else. They struggled and she did not say anything else.

"Q—Aha! yes, how many times did she say, 'aha! yes'?

"A—Twice, aha! yes, and she opened her handbag and then as they struggled neither of them said anything.

"Q—Then, what happened while they struggled . . . what did you do?

"A—Two detonations were heard. I was still at the post office, I was there. And they continued struggling after the two detonations were heard, they still continued struggling and then I was going to leave and he told me to leave, to let her hurt him, 'let her hurt me, but do not let her hurt you.' I went to the door and stood there. They were still struggling. I said, 'This should be informed to the police.' But then I left the post office and I did not go to the police. I went on to the house of my sister who lives in Cristi, my married sister who lives there. And there I found my brother and he took me to my house. And there, in my house, I told my brother what had happened and I told my sister, too.

"Q—Did you see any weapon there, in the hands of anybody?

"A—No, sir.

"Q—Did you see any weapon, specifically, in the hands of Arsenio González Vera?

"A—No, sir.

"Q—And in the hands of Ramonita Sánchez?

"A—No, sir.

"Q—Was there any person in the post office at the time the events occurred?

"A—I saw no one else.

"Q—Only the three of you?

"A—Yes, sir."

. . . . . . . .

MR. FREYRE:

"Q—And you did not see a revolver in the hands of anybody?

"A—No, sir.

"Q—You did not see anybody shoot?

"A—No, sir."

Witnesses Celedonio Muñiz and José Enrique Ruiz, post-office employees, heard the two detonations and immediately they went to the main public hall. There they found spouses González-Sánchez struggling with each other. They had to apply force to separate them.

In the presence of these two witnesses, appellant, under her condition at the time and without any counsel to advise her, blames herself and assumes the consequences or responsibility of the shots.

On the basis of these facts it could not in any manner whatsoever be established, as the information reads, "Said defendant, on the date, place, and under the circumstances stated, illegally, *wilfully*, maliciously, and intentionally, fired several shots with a revolver . . . in the presence of persons who could have received bodily injuries and without it being in self-defense. . . ."

Nobody saw a firearm in the hands of the defendant. As Minguela testified it was at the time that the defendant tried to open her handbag that her husband, Arsenio González, put his hand in the same handbag, producing the violent struggle in the midst of which the two detonations were heard. The struggle still continued when witnesses Muñiz and Ruiz, who had to exert themselves to separate them, appeared at the place. If the weapon was in the handbag, which appellant always denied, most probably during

these tragic moments of violence, anguish, and anxiety, the weapon was discharged accidentally. Who can infallibly affirm that, when the hands of different persons moved desperately inside a handbag containing a revolver to take hold of it, the detonations which were heard were not accidentally produced but wilfully?

■ In our opinion, no evidence was presented to produce the moral certainty that appellant, under the hypothesis that she fired the shots, did it wilfully or with the intent or desire of so doing. Section 32(a) does not contemplate shots which might be discharged in the course or during a fight or corporal strife. When such a thing happens, it implies the violation of § 370 of our Penal Code.[2]

In *People* v. *Aquino*, 79 P.R.R. 17 (1956), as in the present case, defendant was charged with a violation of § 6, another of § 8, and another of § 32(a) of the Weapons Law of Puerto Rico. As it happened in the present case, the trials were held jointly, the felony being tried by a jury and the misdemeanors by the court. The jury acquitted Aquino of the felony; the judge also acquitted him of the offense prescribed by § 6, but he found him guilty of the violation of § 32(a). He was ordered to serve the minimum penalty of thirty days in jail.

The evidence presented by Aquino, not believed by the court, tended to show that another person, surnamed Arroyo, in state of intoxication and bearing a revolver, had entered a cafetín in Añasco, where Aquino was with some friends; the former tried to fire some shots in their presence and the defendant "seized the revolver and in a fight with him and

---

[2] Section 370 provides:

"Every person who, not in necessary self-defense, *in the presence of two or more persons, draws or exhibits* any deadly weapon in a rude, angry and threatening manner, or *who, in any manner unlawfully uses the same, in any fight or quarrel,* is guilty of a misdemeanor." (Italics ours.)

while struggling with the bearer of the firearm, some shots went off."

The evidence for the prosecution on its part showed that said person surnamed Arroyo had been entrusted by his father to take a revolver wrapped in a paper bag to his home; that Arroyo, on his way home, entered a cafetín where defendant was together with some friends playing cards and drinking intoxicating beverages; that while Arroyo was in the cafetín "the defendant took the revolver . . . went to the sidewalk and fired several shots"; that there was no quarrel, fight or discussion there, neither before nor after the discharges.[3]

We affirmed the sentence of thirty days in jail imposed on Aquino. We said in that case:

"[1] The first error was not committed. We need not analyze the evidence in detail. It is enough to say that the testimony presented by the People shows that without any justification the defendant discharged several shots from a revolver while on the sidewalk of a street in Añasco. The trial court did not believe the testimony of the witnesses for the defendant that the revolver went off while the defendant and one Eytón Arroyo were struggling for possession of the gun. We find no basis for interference with the weighing of the evidence by the trial court in this case.

"[2, 3] As to the second error, we cannot agree that the facts show a violation of § 370 of the Penal Code rather than of § 32 (a) of the Weapons Law. Section 370 makes it a misdemeanor to use unlawfully a deadly weapon 'in any fight or quarrel.' Here the testimony believed by the trial court was that the defendant was not engaged in any fight or quarrel when he discharged the revolver several times. The trial court therefore correctly decided that under those circumstances the facts constituted a violation of § 32a of the Weapons Law."

If it had been duly and satisfactorily shown that Aquino actually discharged the revolver, according to his version of the case, we would probably have reversed the

---

[3] We have taken some of the details of the *Aquino* case from the record of the appeal of Criminal Case No. 16,036 which appears in our files.

judgment of conviction because the discharges had occurred accidentally, not wilfully, as required by § 32(a), for the violation of which he was tried.

In this appeal of Ramonita Sánchez Lugo, there is no controversy whatsoever in the sense that the discharges occurred in the course and during a struggle for the possession and control of a firearm, whether it was originally in the possession of the husband, Arsenio González, as his wife always maintained (he had it registered in his name, Exhibit X of The People), or whether the firearm was in a handbag possessed by appellant.[4]

The judgment appealed from will be reversed.

---

[4] The revolver was found in a garbage can in the post-office hall where the facts occurred. All the time defendant denied having the firearm in her possession. When Muñiz and Ruiz arrived at the hall, a few seconds subsequent to the detonations, the weapon was already in the garbage can. When Celedonio Muñiz, at that time, asked appellant about the weapon, after telling him that "she was the only one guilty," appellant answered: "I do not know." (Tr. Ev. 38.)